**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| **YVONNE L. DAVIS,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) CASE NO.: 1:23-cv-00172 |
| | ) |
| | ) |
| | ) |
| **PAIGE BOVA KERVAN,** | ) |
| **MARY DOZIER, and** | ) |
| **AMBER COLEMAN,** | ) |
| | ) |
| Defendants. | ) |

**COMPLAINT FOR DAMAGES AND REQUEST FOR JURY TRIAL**

Plaintiff, Yvonne L. Davis (hereinafter "Davis"), by counsel, files her Complaint for Damages and Request for Jury Trial against Defendants, Paige Bova Kervan (hereinafter "Kervan"), Mary Dozier (hereinafter "Dozier"), and Amber Coleman (hereinafter "Coleman").

1. Pursuant to 42 U.S.C. § 1983, Davis sues Kervan and Dozier in their respective individual capacities for violation of her First Amendment rights by firing her, under color of state law, in retaliation for speaking out on a matter of public concern – fraternization between Dozier and one of her (Dozier's) subordinates, Kelvin Burrell (hereinafter "Burrell").

2. Pursuant to 42 U.S.C. § 1983, Davis sues Kervan and Dozier in their respective individual capacities, for violation of her liberty interests under the Fourteenth Amendment of the United States Constitution by denying her due process before firing her based on false accusations of, among other things, dishonesty, insubordination, and

1

violation of Juvenile Center policies. Defendants' stated reasons for firing Davis were false and stigmatized Davis as dishonest and not fit for government employment.

3. Davis sues Kervan and Dozier for invasion of privacy by casting Davis in a false light by falsely accusing and disciplining Davis for allegedly making "disparaging" remarks about a rehire who had been terminated for cause and falsely accusing Davis of insubordination.

4. Davis sues Kervan, Dozier, and Coleman in their respective individual capacities, under Indiana law for defamation *per quod*. Kervan and Dozier published, with malice, false statements that Davis had 1) poor work performance; 2) had engaged in acts of insubordination; 3) had engaged in acts of dishonesty; and 4) had engaged in unprofessional/disruptive behavior.

5. In Kervan's and Dozier's Corrective Action form identifying Coleman as the publisher of false allegations against Davis, they falsely accused Davis of making a number of statements to Kaila Butler (hereinafter "Butler"). As an example, they falsely accused Davis of making a statement to Butler that she had *heard* that Dozier and Burrell were seen "hugging and kissing."

6. Davis sues Coleman in her individual capacity for tortious interference in her employment contract with the Juvenile Center by falsely reporting to Kervan and Dozier that Davis had induced Butler into writing a false report of suspected fraternization between Dozer and Burrell.

## I.     JURISDICTION AND VENUE

7. The Court has jurisdiction under 28 U.S.C. § 1331 to try the case and has personal jurisdiction over the parties because it involves federal law.

8. The Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

9. Davis is a United States Citizen and was at all relevant times residing in Marion County, Indiana.

10. Defendants Kervan, Dozier, and Coleman were at all relevant times, employed by Juvenile Center.

11. Juvenile Center is a separate employing entity of the Marion County Superior Court of the Marion County Judicial Circuit located in Indianapolis, Indiana.

12. All actions which form the basis of Plaintiff's claims originated in Marion County, Indiana.

## II.    PARTIES

13. Plaintiff, Davis, was at all relevant times, a U.S. Citizen and resident of Indianapolis, Indiana.

14. The Juvenile Center is a subunit of the Marion County Superior Court whose employees are subject to suit under 42 U.S.C. § 1983 for violation of an employee's Constitutional rights.

15. Defendant Kervan was at all relevant times the Chief Operating Officer (hereinafter "COO") of the Juvenile Center, Marion Superior Court, conducting its operations in Indianapolis, Indiana.

16. Defendant Dozier was at all relevant times under the supervision of Kervan as the Superintendent of the Juvenile Center, conducting its operations in Indianapolis, Indiana.

17. Defendant Coleman was at all relevant times employed by the Juvenile Center as an Administrative Assistant to Dozier.

### III. SUPPORTING FACTS

18. Davis incorporates paragraphs 1 through 17 above as if stated herein.

19. Davis was employed as the Director of Staff and Youth Services at all relevant times of this lawsuit.

20. As Director of Staff and Youth Services, Davis supervised Senior Detention Officer Supervisors, Senior Officers, Detention Officers, and the Program Coordinator.

21. The Juvenile Center operates twenty-four hours a day and has three shifts of employees.

22. On or about September 9, 2022, an employee of the Juvenile Center reported to Davis that she had heard a report from a female Detention Officer (hereinafter "DO") that the DO had seen two administration officials at the Shelbyville casino sitting together in what appeared to her to be a possible fraternization relationship, who later turned out to be Superintendent Mary Dozier and Assistant Superintendent, Kelvin Burrell.

23. Davis then identified the source of the information as Kaila Butler, a DO at the Juvenile Center.

24. Upon learning of DO Butler's report, Davis called her into a meeting with Coleman to serve as a witness.

25. Amber Coleman, Administrative Service Manager, was an administrative assistant to both Dozier and Burrell and was a direct report to Dozier.

26. During the course of the meeting, Davis asked Butler what she had seen at the Shelbyville casino.

27. Butler disclosed that she had been at the Shelbyville casino and had seen two administration officials whose names she did not know sitting close to one another at the

dice game and talking and that as soon as they saw that she was looking at them, they left.

28. Butler described the physical appearance of the two administration officials as the male being bald and the female as being light skinned with curly hair.

29. During the same September 9, 2022, meeting with Butler and Coleman, Coleman urged Davis to "tip off" both Dozier and Burrell.

30. Coleman's urging revealed to Davis that Coleman was aware that they were the administration officials that Butler saw at the Shelbyville casino.

31. Davis counseled Coleman that such action would not be appropriate, and that the proper thing to do was to submit the report to COO Kervan for her to investigate if there was any inappropriate fraternization.

32. Coleman pleaded with Davis to tip off Burrell and Dozier because if she didn't, Coleman might lose her job because Burrell was the one who had hired her.

33. Coleman feared that if Burrell found out that she had learned of this report without alerting him, she would get fired.

34. Davis again refused.

35. On September 9, 2022, almost immediately after Butler finished her narrative report, Davis emailed a copy to Kervan.

36. In the early afternoon of September 26, 2022, Burrell came to Davis and told her that Kervan wanted to meet with her.

37. Burrell was off duty on September 26, 2022. Davis, realizing that Burrell was off duty, asked him what the meeting was about.

38. Burrell replied, "I wish you hadn't sent Paige that email." Burrell was referring to the email Davis had sent Kervan on September 9, 2022, with Butler's narrative report of what she had seen at the Shelbyville casino.

39. Burrell also told Davis that Coleman had written a statement.

40. Davis reported to the conference room to meet with Kervan.

41. Dozier was also in the conference room.

42. Upon entering the conference room, Kervan asked Davis where Burrell was.

43. Burrell entered the conference room a few minutes later.

44. Whereupon Dozier commenced reading from a document which Davis later learned was a Corrective Action Discipline form.

45. During the course of Dozier's reading of the Corrective Action Discipline form, Davis interrupted several times, asking for evidence of the accusations Dozier was reading to her.

46. Davis protested several times, telling Kervan and Dozier that the allegations Dozier was reading were not true.

47. Davis asked Kervan for Coleman to be brought into the room so that Davis could confront her about the statements Coleman allegedly had made during the September 9, 2022, meeting with Butler. Davis also wanted to challenge the statements that Coleman was attributing to Davis.

48. Kervan refused, telling Davis, "let her finish, you know how these things go."

49. Dozier finally got to the last sentence of the Corrective Action Discipline form which said that Davis was being fired.

50. Davis was shocked beyond belief. She reacted with shock and outrage, exclaiming to Kervan that she couldn't believe that she was being fired after twenty-two years of an unblemished record and after everything she had done for Kervan and the Juvenile Center.

51. Whereupon Kervan asked Davis to leave the room for a few minutes leaving Davis with the impression that Kervan might change her mind about firing her.

52. About ten minutes after Davis left the meeting room, Burrell came out and told Davis to go home for the rest of the day while they discussed "this"

53. Davis responded "ok," and complied.

54. About an hour or so later Dozier texted Davis telling her that she could either resign or be terminated.

55. Davis declined to voluntarily resign.

56. Davis subsequently applied for unemployment benefits.

57. Lisa Staples (hereinafter "Staples"), at the direction and approval of Kervan, who served as Kervan's Human Resources Manager, signed and submitted an Unemployment Protest (Employer) Form to the Indiana Department of Workforce Development claiming that Davis was terminated for "just cause," listing as reasons for termination 1) poor work performance; 2) insubordination; 3) dishonesty; and 4) unprofessional/disruptive behavior.

58. All of Kervan's and Dozier's stated reasons for terminating Davis were false.

59. The Protest Form was signed by Staples and dated October 7, 2022.

60. On or about October 20, 2022, the Indiana Department of Workforce Development issued its findings in favor of Davis, finding that "claimant [Davis] was not discharged for just cause… It cannot be established that the claimant violated the policy as alleged."

61. Davis had never alleged that Dozier and Burrell were fraternizing as a superior and subordinate; she merely forwarded Butler's narrative report to Kervan.

62. Davis felt morally compelled to have Butler write out what she saw and then to forward to Kervan Butler's narrative report as possible wrongdoing on the part of Dozier and Burrell.

63. Davis reasonably believed that Coleman, working directly for Dozier and Burrell as their administrative assistant, felt compelled to "protect" her supervisors, due to her loyalty to Burrell who had hired her and her fear that if she did not tip off Burrell and Dozer that she would be fired.

64. For several years Kervan had told staff that at the Juvenile Detention Center staff that, although not specifically cited in the Employee Handbook, fraternization between superior and subordinates was prohibited because of the possible undue influence the subordinate might have over the superior and vice-versa.

65. Dozier and Burrell were the known to be the fraternization suspects.  Yet, Kervan allowed them to conduct the investigation into the allegations against them, allowed Dozier to craft the Corrective Action Discipline form, and allowed Dozier to read the allegations to Davis.

66. Kervan did not conduct or cause to be conducted an independent investigation into Butler's report of possible fraternization. Instead, Kervan turned the tables on Davis and accused her of being the wrongdoer.

67. Kervan had previously fired at least two other supervisory employees for fraternization, placing Dozer and Burrell in fear of their own jobs.

68. After terminating Davis and in preparing documents in support of her Protest to the Indiana Department of Workforce Development, Kervan surveyed two employees, Amber Coleman and Bethany Hasbrough (hereinafter "Hasbrough"), asking if either of them "trusted" Davis. Coleman, the same individual who had defamed Davis by writing a false statement against her, said it would be like walking on eggshells working around Davis.

69. Kervan claims that Hasbrough was of the same opinion as Coleman.

## COUNT I. Section 1983

### (Fourteenth Amendment, Due Process – Liberty Interest)

70. Plaintiff incorporates by reference paragraphs 1 through 68 above as if stated fully herein.

71. Because Kervan fired Davis for false reasons which adversely affected Davis's good name and reputation, her liberty interests were at stake.

72. Because Kervan fired Davis based on false allegations of 1) poor work performance; 2) insubordination; 3) dishonesty; and 4) unprofessional/disruptive behavior, Davis was entitled to due process to protect her liberty interests under the Fourteenth Amendment of the United States Constitution.

73. Kervan and Dozier, in their respective individual capacities, acting under color of state law and authority, violated Davis's due process rights by not providing her advance notice of the false allegations against her nor affording her a hearing so as to clear her good name before terminating her.

74. Davis suffered damages resulting from Kervan's and Dozier's violation of Davis's due process rights.

## COUNT II. Section 1983

### (First Amendment Retaliation)

75. Plaintiff incorporates by reference paragraphs 1 through 69 above as if stated fully herein.

76. Davis spoke out on a matter of public concern regarding possible fraternization between two government officials within the Juvenile Detention Center by reporting the incident to Kervan.

77. Davis had no job-related duty or obligation to report the possible fraternization incident.

78. Kervan and Dozier, in their individual capacities and under color of state law and authority, retaliated against Davis for exercising her First Amendment rights when she reported the possible fraternization between Dozier and Burrell incident.

## COUNT III. Defamation *per quod*

### (Kervan)

79. Plaintiff incorporates by reference paragraphs 1 through 69 above as if stated fully herein.

80. Kervan defamed Davis's reputation amongst her peers and community by publishing false allegations of that Davis had 1) poor work performance; 2) had engaged in acts of insubordination; 3) had engaged in acts of dishonesty; and 4) had engaged in unprofessional/disruptive behavior.

81. Kervan published, with malice, the false allegations to a third party, the Indiana Department of Workforce Development, including its employees, and to other third

parties such as staff who have access to Davis's personnel file, including Lisa Staples and future hiring authorities.

82. Davis suffered damages in the form of lost income, lost income opportunity, and other pecuniary damages and compensatory damages resulting from Kervan's defamation of Davis.

## COUNT IV. Defamation *per quod*

### (Dozier)

83. Plaintiff incorporates by reference paragraphs 1 through 69 above as if stated fully herein.

84. Dozier defamed Davis's reputation amongst her peers and community by stating and publishing false allegations that Davis had 1) poor work performance; 2) had engaged in acts of insubordination; 3) had engaged in acts of dishonesty; and 4) had engaged in unprofessional/disruptive behavior.

85. Dozier stated and published, with malice, the false allegations to a third party, Burrell.

86. Davis suffered damages in the form of lost income, lost income opportunity, and other pecuniary damages and compensatory damages resulting from Dozier's defamation of Davis.

## COUNT V. Invasion of Privacy

### (Casting Davis in a False Light)

87. Plaintiff incorporates by reference paragraphs 1 through 69 above as if stated fully herein.

88. Kervan falsely accused Davis of making disparaging remarks about a rehire, Alex Murdock (hereinafter "Murdock").

89. Murdock had been disciplined and subsequently terminated by Terrance Doyle (hereinafter"Doyle") and Kervan sometime around 2017 while he was under the supervision of Doyle and Davis.

90. It was well known that Murdock was good friends with Dozier because he was seen quite often in her office and they both admitted that they were good friends.

91. Over the years since Murdock had been terminated, he had asked Doyle and others to rehire him even though he had been deemed not eligible for rehire because of his previous involuntary termination for insubordination.

92. Kervan and Dozier were both aware of Murdock's involuntary termination and that he was deemed ineligible for rehire.

93. In or around March 2022, Davis learned that Dozier was going to rehire Murdock.

94. Dozier asked Davis whether she would have a problem with Murdock since she knew that Davis and Doyle had fired him several years before.

95. Davis replied that Murdock might have a problem with Davis but that she wouldn't have a problem with him.

96. Davis believes that Dozier falsely reported to Kervan that Davis had said that she had a "problem" with rehiring Murdock.

97. In or around March 2022, Kervan called Davis into a meeting and informed Davis that she was rehiring Murdock and that she had heard that Davis had made a disparaging remark about him.

98. Davis denied making any disparaging remark about him and shared with Kervan the conversation she had had with Dozier regarding Murdock's rehire.

99. After Davis's explanation, Kervan had no further comment.

100. Kervan took no disciplinary action whatsoever against Davis for allegedly making a "disparaging" remark against Murdock.

101. Davis believes Dozier falsely reported to Kervan that she had made a disparaging remark about Murdock so as to protect herself from future criticism for rehiring a friend of hers who was otherwise ineligible for rehire.

102. Dozier overlooked other current employees who were just as qualified and were not classified as ineligible for rehire in favor of her friend, Murdock.

103. During the September 26, 2022, meeting with Kervan, Dozier, and Burrell, Kervan and Dozier included in the Corrective Action the false allegation that Davis had made a disparaging remark against Murdock implying that Davis had previously been disciplined, which was not the case.

104. Moreover, Kervan and Dozier falsely accused Davis of several instances of insubordination towards Dozier for the first time.

105. The false allegations of making disparaging remarks about a recent rehire and insubordination against Dozier cast Davis in a false light.

106. The false allegations harmed Davis's personal dignity and cast her in a false light to anyone who reads the Corrective Action Discipline form placed in her personnel file.

## COUNT VI.

### Tortious Interference in Contract.

107. Plaintiff incorporates by reference, paragraphs 1 through 69 above as if stated fully herein.

108. Davis had an employment contract with the Juvenile Center.

109. Davis had been employed for over twenty-two years and was one of the most senior respected employees with the Juvenile Center.

110. Coleman wrote a false statement against Davis, falsely accusing her, among other things, of attempting to get Butler to make false accusations against Coleman's bosses, Dozier and Burrell that they were seen kissing and hugging.

111. Coleman's false statement contributed to Davis's termination.

112. Davis suffered damages due to Coleman's tortious interference.

## RELIEF

WHEREFORE, Plaintiff requests judgment in her favor against Defendants and that the following be awarded:

a. Damages, including back pay, front pay, with interest, compensatory damages resulting from Defendants' denial of procedural due process under the Fourteenth Amendment;

b. Damages, including back pay, front pay, with interest, compensatory damages resulting from Defendants' First Amendment retaliation;

c. Punitive damages against Kervan and Dozier, in their respective her individual capacities for their reckless disregard for Davis's Constitutional rights and intentional misconduct against Davis;

d. Punitive damages against Coleman in her individual capacity;

e. The costs of this action including reasonable attorney's fees;

f. Injunctive relief in the form of job reinstatement and restoration of all employment related benefits with no loss of seniority;

g. Any other such relief as the court may deem just, proper, and equitable; and,

h. Any relief as the Court deems necessary and proper in the public interest.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury on all issues and questions so triable.

Respectfully submitted,

*/s/ Tae Sture*
Tae Sture, Attorney No. 25120-29
Sture Legal Services, LLC
155 East Market Street, Suite 700
Indianapolis, IN  46204
Ph:  (317)577-9090
Fax:  (317) 577-1102
Email:  tae@sturelaw.com